UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KYLE ALAURA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CAUSE NO. 1:13-CV-287 |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Kyle Alaura appeals the Social Security Administration's determination that he is not disabled. In essence, he argues that the ALJ erred by not giving his treating physicians' opinions controlling weight, failed to derive Alaura's RFC from a hypothetical asked to the vocational expert, and improperly evaluated Alaura's credibility regarding the severity of his symptoms. Because I find that the ALJ relied on substantial evidence in making each of these findings, I **AFFIRM** her decision.

## BACKGROUND

Readers looking for a more extensive discussion of Alaura's medical record are directed to the detailed summaries in the ALJ's decision (R. at 9-28)[1] and in Alaura's opening brief (DE 15). Rather than reiterating those summaries, I will give a brief overview of the history of Alaura's health issues and proceedings before the Social Security Administration.

---

[1] Citations to the record will be indicated as "R. ___."

**Alaura's Health**

In September 2010, Alaura was attacked while leaving a bar by two assailants who hit him in the head twice with some type of blunt instrument and shattered his skull. (R. 256-257) He was taken to the Emergency Room where a CT scan revealed a depressed skull fracture with concussion. (*Id*. at 258) He was then transferred to Lutheran Trauma Center for a neurosurgical/neurological consultation. (*Id*.)

Once at Lutheran, Dr. Kachmann admitted Alaura and performed surgery that same night. (*Id*. at 288, 295) The surgery went well, except that Alaura did have a seizure during the surgery, which Dr. Kachmann treated with the medication Keppra. (*Id*. at 295) Due to his severe post-operative headaches and postconcussive syndrome, Alaura remained in the hospital until September 26, 2010 when he was discharged. (*Id*. at 296, 454) At that point, according to Dr. Kachmann, Alaura was "ambulating without difficulty" (*id*. at 296) with no obvious neurological deficits (*id*. at 18. 454). Alaura was still being treated with Keppra for possible seizures, although he hadn't had any since the operation. (*Id*. at 295-96) Two days later, Dr. Kachmann stated in a Work Status Report that Alaura "May Not Return to Work – Date of injury was 9-1-10. Off x 2 months." (*Id*. at 345)

A November 1, 2010 CT scan showed a small region of missing brain matter – presumably the portion removed during surgery -- but otherwise indicated "no other problems." (*Id*. at 340, 285) Alaura indicated at that time that he was experiencing dizziness, numbness, irritability, and difficulty concentrating. (*Id.* at 343) Dr.

Kachmann found no obvious cognitive deficits. (*Id*. at 454) Dr. Kachmann further noted that he wanted to see Alaura again in a month after some neuropsychological testing, and at that point, they would "decide on returning him to his job" provided had clearance from the neurologist in regards to the EEG interpretation and the neuropsychologist. (*Id*. at 340-41) That subsequent EEG was normal, other than some minor indications of an old injury. (*Id*. at 366)

On November 16, 2010, Dr. Kachmann stated in another Work Status Report that Alaura would not return to work until about December 20, 2010. (*Id*. at 336) On December 14, 2010, Alaura saw Dr. Kachmann's partner, Dr. Banas, for a neurologic consultation requested by Dr. Kachmann. (*Id*. at 368.) Alaura reported that he was experiencing excessive daytime tiredness, difficulty concentrating ("zombie-like state"), trouble falling asleep, unsteadiness and possible vertigo when he moved rapidly, fluctuating headaches, light sensitivity, and pain that increased with exertion. (*Id*.) Dr. Banas also noted that Alaura had had no further seizures and lessened Alaura's dose of Keppra, which would hopefully lessen his fatigue. (*Id*. at 369) He also found that Alaura was doing "reasonably well," but that Alaura would be referred to a neurophysiologist to map any cognitive deficits. (*Id*.) Dr. Banas hoped Alaura could return to full time employment within the year. (*Id*.)

Dr. Kachmann then reissued and extended his previous work restriction on December 27, 2010, stating that Alaura was not to return to work until March 7, 2011. (*Id*. at 328) On January 17, 2011, Alaura returned for a follow up visit with Dr.

3

Kachmann and Physician's Assistant April Christlieb. (*Id*. at 370) Christlieb indicated that Alaura had been weaned from Keppra and had had no further seizures. (*Id*.) There was no redness, swelling, or drainage at his incision. (*Id*.) Alaura reported continued difficulty with headaches, but denied any cognitive difficulties, vision changes, nausea, or vomiting. (*Id*.) According to Christlieb, Dr. Kachmann diagnosed occipital neuralgia and arranged for Dr. Banas to administer a nerve block to treat that condition that day. (*Id*.) Dr. Kachmann found that he did not need to see Alaura again, but that they (Kachmann and Christlieb) would move up his appointment for neuropsychological testing and would "go from there in regards to his returning back to work." (*Id*.)

A few weeks later, Dr. Francis Goff, Ph.D., performed Alaura's neuropsychological testing. (*Id*. at 375) During the test, Alaura reported some improvement – he was driving, his headaches were less frequent, he was taking no pain medications, and his positional vertigo was improving. (*Id*.) Also, he was still having no seizures. (*Id*.) The nerve block had helped, but had now worn off a bit and he was still having some headaches. (*Id*.) Dr. Goff found that Alaura "demonstrated borderline impaired intellectual functioning with low average delayed memory and average to low average attention span." (*Id*. at 376) Alaura reported that he had filed for Social Security Disability and thought that his headaches would render him unable to work. (*Id*.) Dr. Goff expressed no explicit opinion in response to that, but did find that overall, Alaura was continuing to make improvements and that he should contact

Vocational Rehabilitation Services to see if job training was available. (*Id*.) It does not appear that Alaura pursued this option.

A couple of weeks later, Alaura saw psychologist Neal Davidson, Ph.D., in connection with his application for disability benefits. (*Id*. at 378) Dr. Davidson diagnosed Alaura with adjustment disorder with depressed mood, but found his prognosis was good. (*Id*. at 384) He also found that Alaura could "understand, remember, and carry out instructions and perform tasks that are simple and concrete," but that "[h]is frustration with physical limitations may impact his ability to complete a normal workday without minimal interference from psychologically based symptoms." (*Id*.) Alaura did, however, have the "ability to interact appropriately with the public and co-workers." (*Id*.)

On March 11, 2011, Alaura was examined by a State Agency physician who reported that his findings were within normal limits, except for some decreased lumbar spine motion. (*Id*. at 386-89) That physician also indicated that Alaura was suffering from headaches, but not dizziness, trouble walking, nor weakness in extremities. (*Id*.) Another State Agency physician later in March 2011 found that Alaura could perform work at all exertional levels, but that he could not climb ladders, ropes, or scaffolds at all; was frequently able to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and needed to avoid concentrated exposure to noise and hazards. (*Id*. at 395-98)

On March 15, 2011, Alaura saw Dr. Banas for a follow up visit. Alaura reported continued difficulty with headaches, light sensitivity, and insomnia, but stated the last

nerve block had prevented his headaches for three weeks. (*Id*. at 390) Dr. Banas started Alaura on Amitriptyline for the pain and administered another nerve block. (*Id*.) Alaura did not return to Dr. Banas, Dr. Kachmann, or anyone in that practice. In fact, it appears that Alaura did not seek medical care again until a year later in March 2012 when he saw his primary care physician, Dr. Ted Crisman, M.D. Alaura's complaints remained largely the same – headaches, insomnia, some depression with some dizziness. (*Id*. at 459) He denied having had any seizures, although the intake notes indicated that possible "absence type"seizures may be present. (*Id*.) Dr. Crisman prescribed Amitriptyline again for the pain, and Zoloft and Xanax for depression and panic attacks. (*Id*.) He also recommended a daily walking program. (*Id*.) Dr. Crisman referred Alaura to Neuro Northeast for a consultation. (*Id*. at 495)

Alaura then met with Dr. John Collins, M.D., a neurologist at Neuro Northeast. Alaura reported the same issues with depression and headaches that he had reported to Dr. Crisman, only now he also reported that since his surgery, he had been experiencing "staring spells" where he would stare into space for a couple of minutes at a time a couple of times a week. (*Id*. at 496) The is the first indication of this symptom in the record, other than the possible "absence type" seizures noted directly above. Dr. Collins suspected possible seizure activity. (*Id*. at 498) Alaura reported again that the nerve blocks had helped his headaches in the past. (*Id*. at 496) Dr. Collins ordered another nerve block and prescribed various medications for pain, mood disorder, dizziness, and possible seizure, and also referred Alaura for an EEG to determine

whether seizure activity was present. (*Id*. at 499) The EEG came back normal. (*Id*. at 502) His physical examination findings were also normal, except for some tenderness over his scalp, neck, and shoulders. (*Id*. at 497-98) X-rays of his spine from later that month were also normal. (*Id*. at 501)

Alaura then underwent trigger point injections and occipital nerve blocks in May 2012, which helped his headaches. (*Id*. at 485, 493-94) The dull headaches were gone, but the sharp intermittent ones remained. (*Id*. at 485) Overall, Dr. Collins found that the treatment "worked well in the treatment of his headaches." (*Id*.) During this time, Alaura reported to his chiropractor in May 2012 he was having no real symptoms and that he found walking, standing, pulling, riding, sitting, running, holding things, working, lifting, kneeling, bending, stooping and pushing all easier. (*Id*. at 464) Actually, he began reporting most of these improvements and stated he was having no symptoms as early as April 2012. (*Id*. at 467) Alaura then underwent a second round of trigger point injections and nerve blocks in June 2012. (*Id*. at 486)

**Social Security Administration Proceedings**

Alaura applied for disability insurance benefits on December 27, 2010 — just three months after he was the victim of the battery — which is the alleged disability onset date. (R. 12) Alaura was denied on both consideration and reconsideration. (*Id*.) After a hearing before an ALJ in which Alaura testified, the ALJ issued a decision denying benefits. (*Id*. at 9-28)

The ALJ employed the standard five-step analysis. (*Id.*) At step one, the ALJ confirmed that Alaura had not engaged in substantial gainful activity since his application date. (*Id.* at 14) At step two, the ALJ found Alaura suffered severe impairments of traumatic brain injury, seizure disorder, neuropathic pain/headaches/occipital neuralgia, insomnia, adjustment disorder, cognitive disorder status posttraumatic brain injury, anxiety disorder, and mood disorder. (*Id.*) At step three the ALJ found that Alaura's conditions did not satisfy any listed impairment. (*Id.*) At step four, in analyzing Alaura's residual functional capacity, the ALJ found that Alaura could:

> [P]erform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) (lifting/carrying twenty pounds occasionally and ten pounds frequently and sitting or standing/walking for a total of six hours each in an eight-hour period) except that he is not able to climb ladders, ropes, or scaffolds at all and he can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He can occasionally reach overhead. In addition, the claimant can frequently reach in other directions, handle, and finger. He can have only occasional exposure to bright lights and jarring movements. The claimant cannot do any commercial driving or work in an environment where he would be exposed to workplace hazards, such a dangerous moving machinery, unprotected heights, and slippery/uneven surfaces. He can tolerate only a quiet to moderate noise level. Furthermore, the claimant is able to understand, remember, and carry out simple instructions and procedures, concentrate long enough to complete simple changes in a work environment, make simple work-related decisions, and tolerate occasional and/or superficial interaction with the public.

(*Id.* at 16) At step five, the ALJ found Alaura could not perform past relevant work but there were a sufficiently significant number of jobs in the national economy he could perform. (*Id.* at 21-22)

Alaura argues that the ALJ improperly failed to give controlling weight to the opinions of his treating physicians, did not derive Alaura's RFC from a hypothetical asked to the vocational expert, and improperly evaluated Alaura's credibility regarding the severity of his symptoms. I take up each argument in turn below.

## DISCUSSION

If an ALJ's findings of fact are supported by "substantial evidence" then they must be sustained. *See* 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Review of the ALJ's findings is deferential. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). In making a substantial evidence determination, I must review the record as a whole, but I can't re-weigh the evidence or substitute my judgment for that of the ALJ. *Id.*

**Dr. Kachmann's Opinion**

Alaura first argues that the ALJ erred in discounting the opinion of his treating neurosurgeon, Dr. Jeffrey Kachmann. More specifically, Alaura claims that the ALJ erred in not giving controlling weight to Dr. Kachmann's opinion that he should be "off work." (DE 15 at 20) Recall that Dr. Kachmann stated several times that Alaura should remain off work. Dr. Kachmann first made this statement in a November 1, 2010 letter stating, "I would like to refer him for neuropsychological testing to be sure [that he is doing well] before returning him to any type of work driving a forklift . . . . We will

9

decide on returning him to his job providing he has clearance from the neurologist in regards to the EEG interpretation, the neuropsychologist in regards to his neuropsychological testing and future neurologic performance." (R. 340-41) Dr. Kachmann then issued an off work restriction in a November 16, 2010 Work Status Report stating that Alaura couldn't return to work until approximately December 20, 2010. (*Id*. at 336) Then, in a December 27, 2010, Work Status Report, Dr. Kachmann extended that off work restriction, finding that Alaura could not return to work until March 7, 2011. (*Id*. at 328)

The parties focus primarily on the December 2010 Work Status Report, which was not directly discussed by the ALJ. (*See* DE 10 at 18) The fact that the ALJ did not address this statement causes me some pause, but it is not ultimately dispositive. The ALJ did discuss Dr. Kachman's November 2010 finding "that the claimant was disabled." (*Id*.) She afforded "little weight to this opinion as it was rendered shortly after the claimant's brain injury." (*Id*.) Although it's true that an ALJ must build a logical bridge from the evidence to her conclusion, she need not discuss every piece of evidence. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (collecting cases); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998). This is particularly true where an ALJ adequately addresses the substantive issue in question. *Jernigan v. Comm'r of Soc. Sec.*, No. 3:11-cv-491, 2013 WL 1213269, at *1 (N.D.Ind. March 22, 2013).

And that's exactly what happened here. Dr. Kaufmann found in mid-November 2010 that Alaura was disabled and issued an off-work restriction to expire on December

10

20, 2010. (R. 336) About a month later, he extended the restriction for a few more months. (*Id*. at 328) So basically, Dr. Kaufmann's opinion from mid-November until the end of December was that Alaura shouldn't return to work until March 2011. The ALJ adequately addressed this opinion by finding that the November 2010 opinion was rendered too close in time to Alaura's injury and that progress notes from his treating physicians indicated significant improvement in his condition "within a few months of his brain injury." (DE 10 at 18) Certainly a second, essentially duplicative opinion rendered just a month later would also suffer from the same defect. So the mere fact that the ALJ didn't specifically address the December 2010 "off work" opinion isn't enough to warrant remand or reversal.

But did the ALJ err in not affording controlling weight to Dr. Kaufmann's overall opinion that Alaura was unable to work? The Commissioner argues that this opinion cannot receive controlling weight because it is an opinion on an issue reserved to the Commissioner, rather than a medical opinion. (DE 21 at 3, *citing* 20 C.F.R. § 404.1527(a)(2), (d)(1)) Alaura, on the other hand, argues that Dr. Kachmann's statement was "a medical assessment about functioning" and therefore was entitled to controlling weight. (DE 22 at 5)

I don't think either side gets it exactly right. Under 20 C.F.R. § 404.1527(d)(1), a medical source's opinion that an individual is "disabled" or "unable to work" does not mean that the Commissioner will automatically determine that the individual is disabled because that issue is reserved for the Commissioner. *Id*. The Commissioner

will, however, "review all of the medical findings and other evidence that support a medical source's statement that you are disabled." 20 C.F.R. § 404.1527(d)(1). The regulations further state that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(3). What all this adds up to is that a treating physician's opinion that an individual is disabled will not automatically receive controlling weight by virtue of the fact that it's rendered by a treating physician. But that does not mean that such an opinion *cannot* receive controlling weight or that it won't be weighed in favor of finding disability – it's just not entitled to any special significance as a treating physician's medical opinion usually is.

In this situation, I think the ALJ appropriately dealt with Dr. Kachmann's opinion. She explicitly recognized that Dr. Kachmann had found Alaura "disabled" in November 2010, but afforded little weight to the opinion because it was rendered so soon after Alaura's brain injury. (R. 18) She did exactly what the regulations require: although she didn't afford the opinion any special significance, she did weigh and evaluate it, finding that it wasn't overly persuasive given Alaura's improvement a few months later.

I should also note that although Alaura seemingly argues that the ALJ completely discounted Dr. Kachmann's opinion and the opinions of Dr. Kachmann's partners, that simply isn't the case. While it's true that the ALJ didn't find Dr. Kachmann's isolated statement from November 2010 to be particularly persuasive, she

12

*did* give significant weight to Dr. Kachmann's and Dr. Banas's later findings that Alaura had "no obvious cognitive deficits," stopped his medication, was no longer having seizures, denied cognitive difficulties, presented an essentially normal physical examination, and had normal EEGs starting in December 2010. (R. 18-19) In essence, Alaura's doctors initially found that he was having difficulty — as would be expected after the severe brain trauma he experienced — but then found that with treatment and time, he improved. So it's not that the ALJ discounted these treating physicians' opinions entirely, she just gave greater weight to their more recent findings. And it was reasonable for her to do so.

Finally, Alaura makes a lot of the fact that Dr. Kachmann "issued an 'off work' restriction and never rescinded it." (DE 15 at 20) But that doesn't tell the full story. While it's true that Dr. Kachmann said in December 2010 that Alaura was to be "off work," he limited the duration of that restriction, stating "off until 3/07/11." (R. 328) Clearly there was no need to "rescind" this order after March 7, 2011 came and went, particularly given that Alaura had already been found to have improved significantly and stopped seeing any doctors in Dr. Kachmann's practice shortly thereafter. (R. 18-19; DE 15 at 13)

Overall, the ALJ analyzed Alaura's treating physician's opinions appropriately. I therefore find no reason to remand or reverse on this ground.

**Hypotheticals Presented to Vocational Expert**

Alaura next argues that the ALJ erred by presenting different limitations in her hypotheticals to the vocational expert than those contained in the final RFC. While Alaura is correct that the ALJ must build a logical bridge between the evidence and her conclusion, the ALJ hasn't run afoul of this requirement in this case because the differences between the limitations provided in the hypotheticals and the RFC either benefitted Alaura or were *de minimus*.

Alaura challenges the fact that the ALJ questioned the vocational expert regarding an individual who could "frequently reach in other directions and perform fine and gross manipulation," and yet the limitation contained in Alaura's RFC was that he could "frequently reach in other directions, handle, and finger." (DE 15 at 21-22; DE 10 at 62) Alaura doesn't challenge the substance of the ALJ's finding (*i.e.* he doesn't argue that he *can't* do these motions), but instead argues only that the ALJ failed to use the precisely same wording in the hypothetical and RFC.

This issue strikes me as a trifle. I just don't see any meaningful inconsistency here. Common sense says that the terms used in the hypothetical and RFC say the same thing. And although the terms "fine and gross manipulation" and "handle" and "finger" are not precisely defined in the regulations, both the regulations and case law do lend some support to my interpretation that handling and fingering are two examples of fine and gross manipulation. For example, the regulations list "handling" as an example of "manipulative or postural functions." 20 C.F.R. § 416.969a ("Some

14

examples of nonexertional limitations or restrictions include the following: . . . (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.") Elsewhere, the regulations list fingering and handling as examples of "fine and gross movements." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Other courts have also equated these concepts in passing as synonymous. *See e.g. Green v. Astrue*, 08-C-5143, 2010 WL 2523426, at *6 (N.D.Ill. June 18, 2010) (noting ALJ found claimant limited to "frequent fingering (defined as fine manipulation . . .) and frequent handling (defined as gross manipulation)."); *Osborn v. Astrue*, 08-C-7395, 2010 WL 2772480, at *11 (N.D.Ill. July 12, 2010) (stating handling and fingering are manipulative limitations); *Hanna v. Astrue*, 395 Fed.Appx. 634, 635, 2010 WL 3511023, **1 (11th Cir. Sept. 9, 2010) (noting medical examiner found impairment in "fingering/fine manipulation and handling/gross manipulation"). Admittedly, these sources are not dispositive on the issue, but they give me some comfort that my common-sense approach is correct.

Alaura further takes issue with the fact that one of the jobs the VE found Alaura could perform — an "addresser" — satisfied the "light" exertional range RFC when the VE testified that the job was at the "sedentary" exertional level. (DE 15 at 22-23) I don't see any inconsistency here, either. The RFC sets forth the *most* that Alaura can do. 20 C.F.R. 404.1545(a). Thus, it is assumed that he can, of course, do *less* than what is included in the RFC. More specifically, the regulations state that a person who can do light work is also assumed to be able to do sedentary work "unless there are additional

limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. 404.1567(b). Alaura doesn't allege any additional limiting factors that would prevent him from doing sedentary work, nor does he claim that he cannot perform sedentary work. Instead, Alaura's claim seems to be based on the mere fact that the exertional level of the job provided by the VE was more restrictive than the RFC. That doesn't amount to error. *Milliken v. Astrue*, 397 Fed.Appx. 218, 2010 WL 4024908, at *4-5 (7th Cir. Oct. 14, 2010) (finding no error where VE provided a list of jobs based on more restrictions than ultimately found in the RFC). And even if it did, it would be an error in Alaura's favor.

For that same reason, Alaura's complaint that the VE based her analysis on the restriction that Alaura must avoid concentrated exposure to extreme heat and cold, whereas the RFC did not contain this limitation, also fails. Here again, Alaura doesn't argue that the RFC is incorrect — he instead takes issue with the fact that the VE testified based on limitations that were not contained within the RFC. But as above, there is no reason that Alaura, who can apparently tolerate some exposure to extreme heat and cold, cannot perform a job with *no* exposure to extreme heat and cold. *Milliken*, 2010 WL 4024908 at *5.

**Credibility**

Finally, Alaura claims that the ALJ erred in finding his testimony less than credible because the ALJ relied too heavily on Alaura's activities of daily living in contravention of *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012). I don't think that's the

case. This isn't a situation like *Bjornson* where the ALJ took the few things the claimant could do on her one or two good days a week to mean that she could sustain full time work, despite a mountain of medical evidence that she was severely limited. *Id*. at 647. Here, the ALJ can hardly be said to have "relied" on Alaura's activities of daily living — there is very little mention of those activities in her opinion. Instead, as she explicitly stated, she relied primarily on the medical evidence in finding Alaura's and his mother's statements less than fully credible regarding the intensity, persistence, and limiting effects of Alaura's symptoms. (R. 18) And as discussed above, that medical evidence is compelling. Alaura has therefore not shown that this result is "patently wrong" and it will not be disturbed. *Pepper v. Colvin*, 712 F.3d 351, 356 (7th Cir. 2013).

## CONCLUSION

For the forgoing reasons, the decision of the ALJ is **AFFIRMED**. The Clerk is directed to enter a judgment in favor of the Commissioner and against Alaura.

**SO ORDERED**.

ENTERED: February 6, 2015

s/Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT